OK, before you, you have the 1st District 2nd Division Appellate Court, which consists of Aurelia Puchinski, Terry Lavin, and myself, Justice James Fitzgerald Smith. Our sequence of events are as follows. First, the appellant will present their case for 10, 15 minutes without interruptions. Then the justices will have their questions. Then the appellee will give their presentation. And the justices, again, will have their questions. And the appellant will follow with three to five minutes. Since there's three of you, how do you plan to break this down? On behalf of the appellees, I'm arguing, Your Honor, only. OK, that makes sense. All right. Well, then you may proceed. Thank you, Your Honor. I didn't announce the name of the case. Yeah, so our case today is Rita DiPietro versus Gavin Corporation, Gatrix Corporation, and Lucy Santora-Sola in its 1-19-2196. OK, now we can go. Thank you, Your Honor. This is a case brought under conduct that occurred relative to the Employee Sick Leave Act. The ESLA provides an employee can use personal sick leave time, time that's given to them by their employer, for reasons other than being sick. And if you look at the statute, which is in the briefs, they have a laundry list of people that you need to care for, including a parent. In this case, my client, Rita DiPietro, had an elderly mother who had health issues, and she spent time away from work taking care of her. Now, the ESLA specifically provides that an employer cannot retaliate against an employee, including cannot discharge an employee for exercising the rights under the ESLA. In this case, the plaintiff was discharged by her supervisor, Lucy Santora-Sola, in retaliation for her complaining to Santora-Sola and to Santora-Sola's manager that her leave time was being recorded inaccurately, which would soon result in her leave time being exhausted prematurely, thus denying future leave time to care for her mother. Plaintiff filed suit in 2017, and the pertinent complaint now is her second amended complaint, which contains a retaliatory discharge charge claim as well as an intentional infliction of emotional distress claim. Now, obviously, we're here because the circuit court judge granted summary judgment. As to the retaliatory discharge claim, the circuit court judge was of the opinion that the actions didn't violate a clear mandate of public policy. Now, those are the magic words, clear mandate of public policy applicable to retaliatory discharge. And that mandate can be found, and the cases say that statutes reflect public policy, can be found in the ESLA statute itself, both by the rights it gives people to expand the reasons they can call in sick and for the anti-retaliation provision of the ESLA. And the wording is quite broad. It says an employee is protected for using, this is a quote, for using personal sick leave benefits, attempting to exercise the right to use personal sick leave benefits, filing a complaint with the Illinois Department of Labor, or alleging a violation of this act, cooperating in an investigation or prosecution of an alleged violation of this act, or opposing any policy or practice that's prohibited by this act. Clearly, there was an intent to have a broad reading in that area so that people who were treated badly, as was my client, because she was exercising her rights, would have some protection. Now, here's the gist of what was going on that harmed my client, at least the genesis of it. She was told by her supervisor, Ms. Santor Sola, that she had to track her time through a particular computer program and track her time off to take care of her mother. And this program only allowed her to track in half-day or full-day increments. As a result, as she was tracking, maybe she takes off an hour to go to a doctor's appointment, she has to put down a half-day. And as we alleged in paragraph 9 of the second amendment complaint, quote, as a result of the process required by Santor Sola, the computation of DPHO's leave time was being overstated, thus illegally limiting DPHO's right to take leaves in the future. Is it illegal, or is it just that that's the policy that was set for everyone, and she knew when she signed up for the job that that's the procedure? And will an employee has no other option except to follow what the rules are? To answer your question, at the time she took the job, the ESLA was not yet in effect. So she didn't know anything about what type of policy would occur. She wasn't at will employee, no question about that. And she did follow her supervisor's direction that she used this program. So she did what she had to do. She understood that as well. But she did raise several times with her supervisor that this was overstating her leave time, and it was going to be a problem down the road. Also, How many times, if ever, was she denied this leave to go take care of her mom? She never was denied the leave because she was fired before she ever used up all her leave time. Even with the fact that it wasn't being tracked accurately, she still had some leave time when she was fired. But that's the only reason she wasn't denied leave. Her complaint was that, I am going to be denied leave down the road because of this system. And that does violate the statute. The fact that she wasn't denied leave is a function of the fact that she was fired before that could happen. Now, the circuit court judge said that this was purely an internal policy. And I understand what the judge was getting at. But the fact is, it's not the use of this program that's the problem. It's the overstating of time. If, for example, the program was difficult to work with, hard to use, and she just hated using it, and she complained about that, that would be a purely internal policy. But here, the gist of her complaint was that she was going to lose time. And she wanted that corrected before she got to that point. And that's the violation. I think to look at it any other way is to put form over substance. Now, when the circuit court granted summary judgment, they cited Llewellyn versus Shonadig Corporation. In Llewellyn, the plaintiff complained about violations of the Interstate Commerce Act. And the court said, those regs don't even apply to this employee. So that did not create a public policy in Llewellyn. There's no facts anything close to that here. Here, the actions of the defendants are really putting a roadblock in having my client tend to her sick mother. It would have gotten that way once the time was unfairly used up. We don't know. Well, because they fired her first. But that's how the math works. The math would take us there. If she's taking an hour or two hours to take her mother to the doctor, and she has to put down a half an hour of time used, it would be foolish, and I don't think appropriate, for her to wait until there was actually denial of time to bring this to her supervisors and her supervisor's manager to bring it to their attention. And since we're talking about attending to a sick family member, clearly this strikes at the heart of a citizen's rights to be able to take this time off. That's what the legislature thought. Now, defendant depends heavily on McGrath versus CCC. And in that case, the court emphasized that there was an economic issue. The plaintiff in that case, Mr. McGrath, was complaining about the loss of a bonus, a purely economical thing, which under the unusual circumstance of that case, applied only to him. It really doesn't help us here. It has nothing to do with caring for a sick family member, which does go to the hearts of citizens' rights. So I think that's why the circuit court erred. As to the intentional infliction of emotional distress, the judge granted summary judgment on that, on, I think, a very narrow purpose, narrow reason, which was that the conduct by the defendants wasn't sufficiently outrageous. Now, I'm just going to point this out. There are cases cited in my brief, which provide three different circumstances under which the actions of someone can rise to the level of outrageousness. One of is that it's the improper use of a position of power, which gives the defendants the ability to adversely affect the plaintiff's interest. And that's in the Kolagos case, which specifically references employers as people in a position of power. We have that factor here. In McGrath versus Fahey, and it's a little confusing, there's two McGrath cases here. But in McGrath versus Fahey, the Illinois Supreme Court noted that if the offending party, the party being sued, doesn't consider their objective to be legitimate, that that also makes their conduct outrageous. And here we have substantial evidence I've laid out in the briefs that Lucy Santor-Sola fabricated documentation, lied about counseling sessions, sessions not reflected in her, for example, performance reviews. So when she's doing that, she clearly knows her objective is not legitimate. That is sufficient in and of itself to raise the conduct to an outrageous level. Lastly, the third area is Illinois courts have specifically found that a sham investigation, and sham is the word used in the case, Graham versus ComEdison, that if there's a sham investigation, that's sufficient to raise the outrageousness of the conduct. And here, for the same things I've talked about before, the creation of false documents, clearly there was sham documentation used to support this discharge. And here's the key there. It's bad enough to lose your job, but when you find out that things are being made up, that has a different impact on people. It wasn't a difference of opinion. It was stuff that was made up. Because of that, the conduct, I believe, was outrageous. And for those reasons, I think on both the claims, the circuit court should be reversed. Thank you. Any questions? No questions here. Do you have any questions? I do. Mr. Crooks, she was an at-will employee, so they didn't need a reason to fire her. They didn't need to document anything. They could have just fired her. Is that correct? That is correct. And like all discrimination laws, even when a person is at-will and can be fired for any reason or no reason, and I say that phrase to my clients all the time, there are still reasons they can't fire them. They can't fire them for all the various discrimination categories. And in this case, you can't fire them to retaliate against her raising issues about how this statute was being used. Well, she was never stopped from or criticized for taking care of her mother. Nobody ever complained about that. That's correct. And everybody else had the same rule. Is that right? I mean, when she started her employment, she got this handbook, and she knew what the rule was. You're taking time off in four-hour increments. And everybody had that same rule. Is that correct? I mean, it wasn't just her. It was anybody. I don't think there's any evidence that anybody else was taking off time under the ESLA. It was a very new law that went into effect after she started to work there. However she was taking the time off, whether it was for herself, whether it was to go shopping, whatever, whatever she was taking time off for, she had to, like all other customer service employees, track it on the COO, which tracked it in four-hour increments, half-day increments. Is that correct? So nobody else was tracking their time in half-hour increments or hour increments. She wasn't the only one using the half-day increment. That's true in the sense that I have no knowledge that anyone else was taking time off under the ESLA. And I would also point out, her complaint could easily have been responded with a statement that we're going to adjust those things down the road. We'll figure out what the actual time is. We're not going to hold you to those half-hour and full-day programs. Had they done that, the issue would be gone. But instead, they chose to fire her. And that's the nexus of the claim, is her being terminated, not whether or not she was told at some point she had to follow this procedure, which she did follow, because she was told to follow it. Anything further? Nope. Mr. Morris, you may proceed. Thank you, Your Honor. Again, my name is Hal Morris. I represent the Appalese GATX Corporation in Lucy, Santa Sola. With us also is Mr. Gikas, who is co-counsel and was trial counsel. This case, I think, as the court has indicated through its questions, is a case that must be considered within the context in which it arises. The context in which it arises was on a motion for summary judgment. The motion for summary judgment went straight to the elements of the two counts in the case, retaliatory discharge and intentional infliction of emotional distress. This is, as this court has said on occasion, the put-up-or-shut-up moment in a case. In retaliatory discharge, there are three elements to the claim. Unemployment being terminated, which in this case is not contested, the discharge being in retaliation for an action of the employee, and that action must violate a clear mandate of public policy. Retaliation is, therefore, a necessary element. It's an intentional tort. It's axiomatic that to demonstrate retaliation, there must be knowledge that the actor knew of the act and then retaliated. Here, the record that was presented to the trial court is such that the actor, Ms. Santrosola, was not aware of Ms. DiPietro's having gone to HR, and in fact, did not learn of that until after her termination, and her direct supervisor, Ms. McSweeney, testified that she never spoke to Ms. Santrosola about any purported issues being brought by Ms. DiPietro. In a word, consistent with the cases where you have to have an actor being aware and then retaliating, there was no awareness and no evidentiary support, or even a question that Ms. Santrosola knew of any complaints by plaintiff before she was terminated. Moreover, there is nothing in the act that is implicated. Plaintiff read a portion of the act to you in its opening argument. If we parse that specific quote, we can see that there was no violation. Again, the act prohibits certain adverse actions of an employee that uses personal sick leave benefits. There is no such record before the trial court that there was any prohibition of using the sick leave benefit. It prohibits retaliation for filing a complaint with the Illinois Department of Labor. There is no filing of a complaint. It also prohibits an allegation of a violation of the act retaliating for that. There is no allegation that the act has been violated because as the court's questions highlighted, the act does not indicate, nor does it even suggest any way that this time must be tracked. Moreover, the act says that you cannot be fired for cooperating in an investigation or prosecution. There was no investigation or prosecution. Or finally, opposing any policy or practice of the act that is prohibited. None of those are present. Rather, this is a case of an internal policy or procedure of GATX that plaintiff was in disagreement with. She says, I was going to be denied. I didn't like the process. If we go back to the second amended complaint, it clearly sets forth the issue that the plaintiff is looking to litigate here. That issue is the policy or the practice or procedure that GATX used to track employees' sick time. The trial court was correct in finding that because that's what the complaint looks to, it is a purely internal policy of GATX. It's important to note as a threshold matter that no sick leave time was ever refused at any time. Plaintiff retained sick leave as of the time that she was terminated. Nothing in the ELSA suggests or sets forth the matter as to how GATX could or should track time. Nothing before the trial court in the record at summary judgment suggested that this was anything but a dispute over tracking time. Indeed, the face of the second amended complaint makes clear that plaintiff is looking to the manner by which it was tracked. In plaintiff's brief to this court on page 11, plaintiff states an employee cannot discharge an employee for complaining she is being denied the right to use sick time to care for her elderly mother. That is not what this case is about. She was not terminated for using sick time. Rather, plaintiff, I believe, recognizing the lack of a basis argues, again in its brief at page 12, the complaint here is functionally identical to directly being denied sick time. It is not. Number one, it cannot be because she did not use her sick time. What plaintiff is asking this court to do, and I think in some respects, it was illustrated by the questions of the court to plaintiff is to speculate that if in fact she remained employed and if in fact her mother continued to require care and if in fact that care was to be assisted by plaintiff during working hours, she might have been denied ultimate sickline time. We never reached that point. That is a classic advisory opinion the plaintiff is asking for. We do not know what the future could have, would have, or might have created. We don't know whether plaintiff would have run out of sick time. We don't know whether her mother could have improved. We don't know whether others suggested maybe family members would have cared for her. We don't know whether appointments could have been made outside of the workday. We don't know any of these things because those are all speculative. And for this court to say that it is functionally the same would be to issue an advisory opinion. We believe the trial court was absolutely correct in finding as a matter of law on the record that was before it at summary judgment that there was no claim for retaliatory discharge because first there was no evidence of retaliation by Ms. Santra Sola. There was no evidence of a clear violation of public policy. And moreover, to hold otherwise is to take this very limited tort of retaliatory discharge which is used primarily in workers' compensation or whistleblowing cases and extended here would be improper under the Illinois case law. As a consequence, we believe that the trial court was correct for any number of independent reasons in granting judgment to GATX on the retaliatory discharge case. With respect to intentional infliction of emotional distress, again, there are missing portions in the plaintiff's case. Intentional infliction of emotional distress requires a defendant's conduct to be extreme and outrageous. It also requires that the emotional distress claimed by the plaintiff be severe as well as the defendant knowing that severe emotional distress was certain or substantially certain to address. Plaintiff does present substantial facts about her emotional distress. What plaintiff does not do other than to cite to cases that suggest that respective positions of the parties could or might result in extreme and outrageous conduct does not go the next step which says that that is not dispositive standing alone. Rather, the conduct still needs to be so outrageous, so extreme to a degree that it's beyond all bounds of decency. We need to closely circumscribe, as this court and the Supreme Court has done, the tort of intentional infliction of emotional distress, especially in an employment context. If not, in most every employee employment situation, there would be such a claim. If we look at the cases that this court has decided and other Illinois courts have decided and found that there was not extreme and outrageous conduct, that is very illustrative for us. If we look at the Milton case, there there was a focus on an illegal nature of conduct. But if you look at Ulm, a demand to engage in illegal conduct was not sufficient. In Vickery, even a bad faith investigation was not sufficient. In Lundy, where they stripped a police officer of his gun, stated he had mental problems and put him on administrative duty, that was insufficient. Extortion was not sufficient in Gray. And even the threat of prison time was not sufficient. Here, however, plaintiff says, there are items in my personnel file with which I do not agree. Those in and of itself, we would suggest, based on the case law, are insufficient statements of evaluation and are not actionable in any event. Moreover, they cannot be actionable because as the court pointed out, Ms. Santosola was an employee at will. As an employee at will, GATX could fire her for a reason or for no reason. Plaintiff says, but you could not do it for a discriminatory reason. That may be true, but not in this case. There is no question that there is no discrimination here. Plaintiff, again, ties back to the Employee Sick Leave Act and the Employee Sick Leave Act does not provide a safe harbor for the plaintiff in this case. Because as we've indicated earlier, there is no requirement, there is no suggested method, there is nothing to say that the manner by which GATX had all of its employees record time out of office can be actionable under that act. When faced with a motion for summary judgment as the plaintiff was here, the facts presented by the plaintiff and opposition need to be sufficient to raise a question, a genuine question of material fact. That is a failure in this case and the trial court recognized it as such. If a plaintiff fails to even miss one or establish one element of a claim, the claim is necessarily dismissed. It is a fatal error. Here, that is what occurred. There is no triable issue because under both retaliatory discharge as well as under intentional infliction of emotional distress, the plaintiff did not establish through evidentiary facts or create a question of fact on several of the individual and independent elements of those claims. In terms of retaliatory discharge, there is no proof and there is no evidence of retaliation. In terms of whether there is a violation of a clear public policy, that is not present as well either because this is a question not of a violation of policy but a question of the manner by which internally GHX acted. And to characterize this plaintiff suggests is to ask this court to enter an advisory opinion that a bunch of ifs would have to occur and then the plaintiff would not have any leave time left to exercise, but we have never been reaching that point and we can never reach that point absent a crystal ball which none of us have. In terms of intentional infliction of emotional distress, the conduct asserted is simply not outrageous under Illinois law. Moreover, there is not a showing that defendant knew that severe emotional distress would result from anything she did. To hang on to the safe harbor where it doesn't exist that there is a position of power or difference between employer and employee in and of itself is not enough, it must still be as we've indicated, outrageous. To countenance a claim that is functionally identical to directly being denied leave claim is which plaintiff now seeks to do before this court is to permit an advisory opinion. The trial court would not permit that. We would urge this court not to print that at all. And we would urge this court to affirm because the trial court did not air by granting judgment in favor of GTX and Ms. Santra Sola. Mr. Morris, counsel indicated that the role under which her time was made was not in effect when she was hired. Unless I misunderstood him. No, he said that, but it's irrelevant to this question. And the reason I would submit that it is irrelevant to the case before the court is, whether the rule is there or the law is there or not, the law did still, once it was passed, did not change the employment relationship. GTX as an employer still had the right and it had the discretion to apply whatever it wanted to in terms of tracking. GTX could not have said, I would submit, once the law came into effect, you as an employee can take sick leave time, but you can't take sick leave time for a sick parent. That would have changed. But the manner of tracking never changed and there was never a mandate to track in a particular fashion. Anybody else have some questions?  Aurelia? Okay, thank you. All right, Mr. Perks, you may proceed. Thank you, your honor. Counsel indicated that there was no knowledge on behalf of Lucy Santora Solo of the complaints made by Ms. DiPietro, which is just nonsense. We provided the evidence in the summary judgment proceedings. Twice, Lucy Santora Solo made handwritten notations on emails that she had been contacted by Lucy McSweeny, who was her manager and told that Rita DiPietro did not have to use the out of office program, which was causing the problems. Twice she made those notations. It's beyond belief and the circuit court did not find this, that she didn't know that Ms. DiPietro had had contact McSweeny and made a complaint about that after having made that complaint many times to Lucy directly. Counsel makes much of the fact that she was never denied sick time, but that's because they fired her. Do we need a crystal ball to tell what would happen? We would need that if this were a lawsuit about I was denied five sick days when I should have got them under the act, and then that would have to happen. This lawsuit, the retaliatory discharge, it's about a discharge, which did take place when she raised the issues of what was going to happen down the road. Counsel discussed the Alm case, Alm versus Memorial Medical Center. And in fact, the Alm case turned on the fact that the issue that the plaintiff had complained about that led to her termination was a problem she had personally caused. It was her responsibility to handle that matter she complained about. A very unusual set of facts that certainly justify equitably denying that complaint. The Lundy case, while they didn't find extreme and outrageous conduct in that case, they did support the fact that a position of power did in fact raise the level of outrageousness. And lastly, the comment about the plaintiff didn't agree what was in her personnel file. Now that sounds like a very fair statement, and it would be if her complaint was, gee, I see these criticisms of me. I don't think I did that stuff badly. I thought I did a good job. Lots of employees disagree with their supervisors about things like this. In this case, she was referring to documentation that purported to be counseling sessions about her work that had taken six and eight months earlier. In fact, it had taken place in 2016, she was fired in 2017. These counseling sessions never took place. The fact that they were fabricated in the documentation is laid bare by the fact that on one of the documents, Lucy Santorsola dates it a date in October or November of 2017. My client was fired well before the fall of 2017. She was fired in, I believe, June of 2017. But when Lucy Santorsola was creating the fabricated documentation to support the termination, she accidentally put on the date on it, the year date that she was actually writing the documentation. I think that should be considered both in the response to what counsel argued about disagreeing with the personnel file, but also has to be considered in the outrageousness. When you find out your supervisor is making stuff up and creating documentation to support her false stuff, that makes it a good deal more outrageous. And that's why the cases talk about sham investigations and talk about not knowing, not believing in the legitimacy of what you're doing. Clearly, Santorsola did not. The fact is Lucy went, I'm sorry, Ms. Santorsola went to HR to discuss terminating the plaintiff three days after she found out through her communication with McSweeney that the complaint had been made. So there's a clear connection. And for all those reasons, this case should be reversed and sent back for trial so a jury can decide these issues. Thank you. No questions. Okay, counselors, thank you very much for your time. The briefs were very well informative and you both argued very well. So we'll let you know in the next week or two, the results. Thank you.